MATRIX NETWORK, INC., Appellant,

v.

Larry M. GINN, Lonnie J. Ginn, Genomega Software Systems, Inc., and DVR Connections, L.L.P., Appellees.

No. 05–06–00604–CV.

Court of Appeals of Texas, Dallas.

Jan. 12, 2007.

Joann N. Wilkins, Simon D. Whiting, Burford & Ryburn, L.L.P., Dallas, for appellant.

David ˙ McCue, McCue Wysocki, P.C., Dallas, for appellees.

Before Justices MORRIS, WHITTINGTON, and RICHTER.

## OPINION

Opinion by Justice MORRIS.

This is an accelerated appeal from the trial court's interlocutory order denying Matrix Network, Inc.'s request for a temporary injunction in its lawsuit against Larry M. Ginn, Lonnie J. Ginn, GenOmega Software Systems, Inc., and DVR Connections, L.L.P. Matrix contends the trial court abused its discretion in denying injunctive relief. Because Matrix did not establish it would suffer a probable imminent and irreparable injury in the absence of a temporary injunction, we affirm the trial court's order.

Matrix sells digital video recorders (DVRs) and other closed circuit television components to companies that provide security services. Matrix hired Larry Ginn as an employee in 2004 to provide engineering and technical support services. Ginn had previously worked for Matrix as an independent contractor through Ginn's company, GenOmega Software Systems, Inc.

In January 2005, Matrix learned that its DVR manufacturer, Intelligent Digital Integrated Security (IDIS), had embedded software in its DVRs to provide remote viewing capability using dynamic domain name service (DDNS).[1] IDIS named the new feature DVRNS. Matrix discussed this new feature with ADT, one of its largest customers. As result, Matrix planned to develop a service that would enable ADT to charge its customers for remote viewing of security cameras using DDNS and IDIS's DVRNS.

Larry Ginn was involved in the development of this new product. After testing IDIS's DVRNS software, Ginn prepared a report that was forwarded to IDIS suggesting, among other things, the inclusion of an authentification feature. ADT ultimately chose not to pursue the remote viewing service and Matrix decided to develop and offer the service on its own. Matrix sought to combine the DVRNS software with an account management software that Ginn would write to control account access and management of the remote viewing. Ginn had indicated to Matrix, however, that IDIS had to supply the modifications he had previously requested before he could write the account management software.

IDIS informed Ginn it would supply the modifications by October. In August,

---

1. A DDNS provider uses a special program that runs on the user's computer that contacts the DDNS service each time the internet protocol address provided by the internet service provider changes and updates the database to reflect the change in internet protocol address. This system differs from a static internet protocol address that is permanently assigned to a device and does not change.

Ginn resigned from Matrix to take a contract job with another company. He continued, however, to host Matrix's websites, email, and perform other work for Matrix through his company GenOmega. Ginn and Matrix also had discussions about Ginn continuing to develop Matrix's DDNS, although there was conflicting testimony at the hearing as to the parties' understanding of these discussions. By mid-September, Ginn realized his new contract job was not going to be available. He therefore turned his attention to the DDNS remote viewing project. After seeking assistance from his brother Lonnie, Ginn obtained a DVR and other items. He also spoke to another software engineer who suggested an approach that did not use IDIS's DVRNS embedded software. Ultimately, Ginn developed account management software that used DDNS to provide DVR remote viewing without IDIS's DVRNS or the DVRNS modifications he had requested from IDIS. His product also contained additional features that Matrix's product did not contemplate. Ginn formed a company with Lonnie called DVR Connections, L.L.P., to own, operate, and host the software on its server.

Matrix informed Ginn in mid-October that the IDIS modifications would be ready at the end of the month. Ginn responded that he had already completed account management software for a DDNS remote viewing service that did not require IDIS's embedded software. Ginn and Lonnie met with Matrix representatives to demonstrate his system. Later, Ginn received a letter from Matrix asserting he had violated the non-disclosure agreement he had signed while an employee at Matrix by developing his remote viewing system.

Matrix sued Ginn, Lonnie, GenOmega, and DVR Connections for breach of the non-disclosure agreement, breach of fiduciary duty, and unfair competition. Matrix then sought a temporary injunction, which the trial court denied. In its order, the trial court accepted appellees' representation that they would comply with the first paragraph of the non-disclosure agreement which restricted the solicitation of Matrix customers and employees for one year after termination of Ginn's employment. The trial court's order further concluded that Matrix did not establish a probable right of recovery or that a probable imminent and irreparable injury would occur between now and the trial on the merits. Matrix filed this appeal.

Before analyzing the merits of this appeal, we must first address appellees' motions to dismiss the appeal and for damages. In their motions, appellees assert that events occurring while this matter was pending have rendered this appeal moot. They further assert that because appellant filed this appeal solely for the purposes of delay, we should impose damages for a frivolous appeal. We disagree with appellees on both assertions.

In support of their motion to dismiss, appellees contend (1) the expiration of the non-solicitation provision in the non-disclosure agreement and (2) appellant's public disclosure of its secret business plan that forms the basis of its misappropriation complaints against appellees necessarily means a controversy no longer exists. Appellant responds that it is not the non-solicitation provision that is the subject of this appeal. Instead, it is the non-use and non-disclosure obligations that form the basis of appellant's claims. We agree with appellant. We perceive the gravamen of appellant's complaints on appeal and in the trial court below to be that appellees are trying to compete unfairly by using and disclosing appellant's business plan, which it alleges is a trade secret or confidential information. In such circumstances, we

cannot conclude the expiration of the non-compete clause or appellant's public disclosure renders this matter moot. We therefore deny appellees' motion to dismiss this appeal. Likewise, because we are unpersuaded by appellees' contention that this is a frivolous appeal, we deny appellees' motion for damages. We proceed to address the merits of the appeal.

■ In its sole issue, Matrix contends the trial court abused its discretion when it denied its application for injunctive relief. A temporary injunction serves to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). It is an extraordinary remedy and will not issue as a matter of right. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex.1993) (per curiam). For a temporary injunction to issue, the movant must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; (3) a probable, imminent, and irreparable injury in the interim; and (4) no adequate remedy at law. *Butnaru*, 84 S.W.3d at 204.

■ We review a trial court's decision to grant or deny an application for temporary injunction for an abuse of discretion. *Id.* The trial court does not abuse its discretion if some evidence reasonably supports its decision. *Id.* at 211. Moreover, the trial court does not abuse its discretion in denying a temporary injunction if the movant failed to prove one of the requirements for a temporary injunction. *See Tom James of Dallas, Inc., v. Cobb*, 109 S.W.3d 877, 889 (Tex.App.-Dallas 2003, no pet.).

■ Our analysis focuses on the third element of the temporary injunction test. Matrix contends it proved it would suffer a probable, imminent, and irreparable injury absent a temporary injunction. Matrix first relies on the testimony of Matrix's president Jim Tomcheck stating that he estimated that as of May 2006 Matrix would have lost about $100,000 in revenue from the delay in bringing their remote viewing service to market. Tomcheck's testimony, however, reveals that any alleged delay damage is not in fact irreparable but capable of being remedied by a damage award at the conclusion of the trial.

Matrix further relies on Tomcheck's statements that he was concerned about Matrix's relationship with ADT because Ginn, who was involved in Matrix's internal meetings, might possibly go out and give his product to ADT's customers. Tomcheck further testified that he believed appellees would target Matrix customers and that appellees indicated they wanted to sell their product to ADT customers. Ginn testified, however, that appellees had never knowingly solicited any Matrix customer. Although there was evidence that appellees intended to market their product generally, there was no evidence with respect to the impact this would have on Matrix. No evidence showed whether Matrix intended to offer its product to the public at large or it intended to focus merely on its preexisting customer base.

■ Additionally, there was evidence that appellees' product had additional features Matrix's product did not have. The trial court heard testimony that Matrix would have its own product developed by May 2006. The trial court also accepted appellees' representation that it would not solicit Matrix customers until September 2006. Therefore only Matrix would be able to market its product to Matrix customers until September 2006. At best, Matrix's claimed injury is merely speculative. Such fear and apprehension of injury are not sufficient to support a temporary

injunction. *See Jordan v. Landry's Seafood Rest. Inc.*, 89 S.W.3d 737, 742 (Tex. App.-Houston [1st Dist.] 2002, pet. denied) (op. on reh'g). Matrix also provided no evidence explaining why it could not arrive at a damage figure to compensate it for any lost business or other damages at the conclusion of a trial on the merits.

Finally, Matrix argues we should presume harm in this case because it is undisputed that Ginn possessed confidential information about Matrix's business plan when he designed and developed his DDNS remote viewing service. Matrix asserts if appellees are allowed to market their product before Matrix markets its own product, it will lose its competitive advantage to create a market for a product its competitors do not have. Matrix defines its competitive advantage as the ability to offer DVRNS to IDIS DVR users and supply technical support for the software as well as support for the hardware. The undisputed evidence, however, reveals appellees' product does not use IDIS's DVRNS. Nor was there any evidence suggesting that appellees would offer the same hardware support Matrix had envisioned for their product. As such, the record does not support Matrix's assertion that appellees would be directly competing with it. In fact, the record contains conflicting evidence with respect to whether appellees intended to market their product to Matrix's customers and competitors. Matrix witnesses testified appellees had stated they intended to target Matrix's customers and competitors. Ginn, however, testified that he was staying away from Matrix's customers and targeting the end users of other security companies.

Viewing the evidence in the light most favorable to the trial court's order, we conclude that Matrix has failed to establish that it faced probable, imminent, and irreparable injury in the absence of a temporary injunction. Accordingly, the trial court did not abuse its discretion in denying appellant's application for a temporary injunction. We resolve Matrix's sole issue against it. We affirm the trial court's order denying the temporary injunction.